# EXHIBIT 1

Page 2

```
 1         UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF OHIO
 2                 WESTERN DIVISION
              CASE NO:  3:07-CV-818
 3
 4
    TINA M. BROWN,         )
 5        PLAINTIFF,       )
    VS.                    )
 6  HCF OF SHAWNEE, INC.,  )
        DEFENDANTS.    )   WITNESS:
 7                     )   TINA M. BROWN
 8          * * * * * * * * *
 9
10        The deposition of TINA M. BROWN, a witness
11  herein, was taken by the Defendant as upon
12  Cross-Examination and pursuant to the Federal Rules of
13  Civil Procedure and agreement of counsel at the Allen
14  County Courthouse, 301 North Main Street, 2nd Floor, Lima,
15  Ohio, on February 21, 2008 at 9:37 a.m., before Jennifer
16  Davis, CSR, a Notary Public.
17
            * * * * * * * * *
18
19
20
21
22
23
24
```

Page 3

```
 1  APPEARANCES:
 2        On behalf of the Plaintiff,
 3        Nicholas E. Kennedy, Esq.
          Kennedy, Reeve & Knoll
 4        98 Hamilton Park
          Columbus, Ohio  43203
 5        (614)228-2050
 6        On behalf of the Defendants,
 7        Michael D. Homans, Esq.
          Flaster Greenberg
 8        1628 John F. Kennedy Blvd.
          15th Floor
 9        Philadelphia, Pennsylvania  19103
          (215)279-9379
10
11
12          * * * * * * * * *
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1           S T I P U L A T I O N S
 2        It is stipulated by and between counsel for the
 3  respective parties that the deposition of TINA M. BROWN, a
 4  witness herein, called as upon Cross-Examination by the
 5  Defendants may be taken at this time and place pursuant to
 6  the Federal Rules of Civil Procedure and agreement of
 7  counsel as to the time and place of taking said deposition;
 8  that the deposition was recorded in stenotypy by the court
 9  reporter, Jennifer Davis, CSR, and transcribed out of the
10  presence of the witness; and that said witness has reserved
11  signature of said deposition.
12
            * * * * * * * * *
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

```
 1              I N D E X
                                      PAGE
 2  WITNESS:  TINA M. BROWN
 3  CROSS-EXAMINATION:
        By Mr. Homans......................   7
 4
 5  REPORTER'S CERTIFICATE .................. 210
 6
            * * * * * * * * *
 7
 8
 9
10
...
24
```

Page 86

1  come in until I had spoken with Scott or
2  Jerome. And he said he was aware of the
3  problem. And I asked him what that was.
4  And he said your attendance is awful. And
5  I asked him what he was talking about. And
6  he said that I had missed so much work.
7  And I explained to him that I was on FMLA,
8  and the time that I had missed was probably
9  under the FMLA, because I only took off to
10 care of my father. And he said this is not
11 an FMLA issue. This is an attendance
12 issue. He was very rude. And he actually
13 told me, "What do you want me to do? Wipe
14 the slate clean, and let Tina blame it on
15 her father?" So, I just basically told him
16 that I must, I made a mistake calling him
17 and that was the end of that conversation.
18 Q. Okay. Anything from that conversation that
19    you recall?
20 A. That's what I remember.
21 Q. Okay. And you said that, in your opinion,
22    I think you said he was unprofessional or
23    not professional -- wait, I'm sorry. You
24    said rude?

Page 87

1  A. Yes. I thought it was rude, and it was
2     unprofessional.
3  Q. And why did you say it was rude, just the
4     comment about your father or?
5  A. Just the whole conversation. I was trying
6     to come to him and talk to him, and try to
7     find out what was going on, because I
8     didn't understand. And he, I mean, right
9     off the bat was very rude and sarcastic.
10    And, basically, I felt like he was just
11    kind of poo poo'ing me off like it was
12    unimportant.
13 Q. Right. Did you feel like he disagreed with
14    what you were saying as far as your
15    attendance issue?
16 A. Yes.
17 Q. Okay. Okay. Anybody else present for that
18    conversation?
19 A. No.
20 Q. Okay. By telephone?
21 A. Not on my side, no.
22 Q. It was by telephone?
23 A. Yes.
24 Q. Okay. Okay. After you met for the

Page 88

1     termination, and I guess Mr. Okarowski, and
2     Lori Cecil and Mr. Dennings was there also?
3  A. Yes.
4  Q. After they explained the reason for
5     termination, did you follow-up with
6     Mr. Okarowski?
7  A. No.
8  Q. Did you follow-up with the president of the
9     company?
10 A. No.
11 Q. Okay. Is there a reason you didn't contact
12    the president?
13 A. Because I felt if I was going to go to
14    Mr. Okarowski, and I was going to get
15    treated like that, Mr. Unverferth is
16    basically the company. I mean, I felt
17    like, you know, if I could not go to him or
18    him, then it was going to be a dead end to
19    go any further than that.
20 Q. Okay.
21 A. It was an FMLA issue.
22 Q. Okay. Do you see the last line on this
23    problem solving procedure states, "If you
24    feel you've been subject to discrimination

Page 89

1     or retaliation, please contact the Vice
2     President, Human Resources, or the
3     President immediately"?
4  A. Yes. I see that.
5  Q. Okay. After you were terminated, did you
6     contact either one of them?
7  A. No.
8  Q. Okay. Did you feel that you had been
9     discriminated against or retaliated
10    against?
11 A. Yes.
12 Q. Okay. But you chose not to contact them?
13 A. I didn't because I tried to contact, I
14    tried to go to corporate. I went to
15    Mr. Okarowski.
16 Q. Okay.
17 A. I felt it was a conflict of interest for me
18    because Scott is an Unverferth.
19 Q. Okay. Okay.
20 MR. HOMANS: Why don't we take a little break now, and
21    then go to 12:30.
22 (Brief recess.)
23 Q. Let's back up, Ms. Brown, and talk about
24    your performance at HCF.

Page 150

1   they would pick it up.
2 Q. Okay.
3 A. So he would have to talk to whoever he was
4   planning on putting on the schedule.
5 Q. And then what would be done as far as the
6   written schedule then to show who was
7   working?
8 A. After he discussed it with you then he
9   would put you on the schedule. There was a
10  lot of times the schedules were padded.
11 Q. Okay. Padded meaning what?
12 A. Meaning that they would add people to the
13  schedule to make it look like the floors
14  were covered. They would put people on
15  there that were not scheduled to work.
16 Q. Put people on the schedule who were not
17  scheduled to work?
18 A. Yes.
19 Q. Okay. Do you recall that ever happening
20  with you?
21 A. Yes.
22 Q. Do you have any document that shows that?
23 A. I don't have any of the actual floor
24  schedules, but I know that it has happened

Page 151

1   a lot.
2 Q. Okay. Did you ever report that to anyone
3   during your employment?
4 A. Yes.
5 Q. Who did you report it to?
6 A. The scheduler, Melanie Taylor, the DON.
7 Q. Okay. What is the floor schedule?
8 A. That's the schedule that tells everybody
9   where they are going to work.
10 Q. And how often does that come out?
11 A. Every day for first, second, and third
12  shift.
13 Q. Okay. Okay.
14 MR. HOMANS: Let's mark this as Exhibit 16.
15 (Defendant's Exhibit No. 16 was marked for the purpose of
16 identification.)
17 Q. You've been handed Exhibit 16 marked Bates
18  stamped D117. Is that your handwriting at
19  the bottom?
20 A. Yes. It is.
21 Q. Okay. And this is the schedule for
22  February 27, 2005 through March 28, 2005?
23 A. Yes.
24 Q. Okay. And if I can read this, your

Page 152

1   indicating, "I will work PU." Is that
2   pick-up?
3 A. Yes.
4 Q. "On March 2nd, March 9th, March 14th, March
5   23rd." And then you put "Third shift
6   preferably E, F or float"?
7 A. Yes.
8 Q. So in this case you did prefer E, F or
9   float?
10 A. Yes. They allowed us to do that when we
11  picked up.
12 Q. Okay. But, I mean, you did have a
13  preference. It wasn't like every wing is
14  equal. You preferred E and F?
15 A. I took classes for the Alzheimer's Unit.
16 Q. So you did prefer them?
17 A. Yes.
18 Q. And you state, "I will watch floor schedule
19  for my name or you can let me know." Okay.
20  So you're telling them you would watch the
21  floor schedule to see if you were
22  scheduled for these dates?
23 A. Yes.
24 Q. Okay. And then there's some handwriting up

Page 153

1   above, I guess, on some of these dates. Do
2   you recognize that handwriting? First, let
3   me ask you, there's PU written on the dates
4   you indicated?
5 A. Yes.
6 Q. Do you know whose handwriting that is?
7 A. No. I don't.
8 Q. Okay. And then like from March 9th there's
9   PU and then kind of a line, and it's hard
10  to tell on this copy, but it looks like for
11  that day and for March 22nd, "no" was
12  written. Do you recall that?
13 A. No.
14 Q. Do you recall on those two dates you
15  weren't actually given, you know, put on
16  the schedule?
17 A. I don't remember being put on the schedule
18  for any of those dates.
19 Q. Okay. So you don't, when you say you don't
20  remember, do you not know whether you were
21  scheduled for any of those?
22 A. I was not scheduled for any of those dates.
23 Q. Okay. You didn't work March 2nd?
24 A. The pick-up? I don't think so. I don't